MAINE SUPREME JUDICIAL COURT                    Reporter of Decisions
Decision:      2026 ME 89
Docket:        Aro-25-177
Argued:        March 3, 2026
Decided:       August 13, 2026

Panel:         STANFILL, C.J., and MEAD, CONNORS, LAWRENCE, DOUGLAS, and LIPEZ, JJ., and
               HJELM, A.R.J.

STATE OF MAINE

v.

JAYME SCHNACKENBERG

DOUGLAS, J.

[¶1]  A jury found Jayme Schnackenberg guilty of murder, 17-A M.R.S. § 201(1)(A) (2026), and the court (Aroostook County, *Nelson, J.*) sentenced him to fifty-five years in prison.  In this appeal, Schnackenberg challenges the court's exclusion of the results of the victim's toxicology report, the court's admission of three photographs depicting the victim's skull, and the court's failure to give the jury a proper self-defense instruction.  He also challenges the sentence imposed by the court.  We affirm the judgment and the sentence.

## I.  BACKGROUND

[¶2]  When the evidence is viewed "in the light most favorable to the State, the jury rationally could have found the following facts beyond a reasonable doubt."  *State v. Aldrich*, 2026 ME 8, ¶ 2, 353 A.3d 987.

2

[¶3] On the morning of June 16, 2023, in their home in Monticello, Schnackenberg shot his girlfriend of six years twice in the head. He disposed of her body near a logging road in a remote wooded area.

[¶4] The victim's friends and family, worried when unable to reach her, contacted Schnackenberg to inquire about her whereabouts. He claimed that he did not know where she was, saying "[she] grabbed a backpack and she left" to go on a hike on the morning of June 16.

[¶5] On June 18, 2023, the victim's mother called law enforcement to report that the victim was missing. Two Maine State Police troopers spoke with Schnackenberg about the victim's disappearance. He reiterated essentially the same story that he had told others, namely that two days earlier the victim "packed a bag full of clothes" and "took off." He told the troopers that she left around 5:00 in the morning and denied that there had been any recent fights between them. He repeated the same story to another Maine State Police trooper investigating the matter who contacted him two days later.

[¶6] Contrary to the version of events he had given to law enforcement and others, however, just after the shooting on June 16, 2023, Schnackenberg gave a very different account of the victim's disappearance to two acquaintances, Brian Vrieze and Craig Vrieze. Schnackenberg went to their

house in Monticello between 6:30 a.m. and 8:00 a.m. that same morning and told the Vrieze brothers that he shot the victim twice in the head because she was leaving and taking their cat. He said that he needed to go back to his house to "take care of that," which Brian Vrieze understood to mean take care of the victim's body. He also told them that he and the victim fought "constantly" about his spending money on drugs.

[¶7] On June 22, 2023, law enforcement began searching wooded areas in Monticello. They located Schnackenberg's pickup truck and towed it to the State Police barracks in Houlton. Two cadaver dogs "alerted" on the bed of the truck, indicating the presence of human remains.

[¶8] On June 24, 2023, law enforcement executed a search warrant at Schnackenberg's residence in Monticello. Officers found a disassembled Taurus .40 caliber pistol in a Folgers Coffee can in the midst of construction debris behind the house. They observed reddish-brown stains in the kitchen and collected samples for testing and analysis at the Maine State Police Crime Lab. They also collected a mop hanging in the basement stairway after the mophead tested presumptively positive for blood. In a subsequent search on June 27, 2023, officers recovered a roll of duct tape from a toolbox at the residence.

4

[¶9]  While the search on June 24 was underway, two Maine State Police detectives spoke with Schnackenberg.  He continued to maintain that the victim left the house on foot on the morning of June 16, leaving her car behind.  The detectives confronted Schnackenberg about his statement to the Vrieze brothers that he shot the victim twice.  Schnackenberg denied this, and said, among other things, "You can't prove any of that though," "You'd have to have a body to prove that," and "If you could prove . . . any of it, I'd be under arrest right now."

[¶10]  The following day, the owner of a camp located near where Schnackenberg had deposited the victim's body contacted law enforcement. The camp owner had seen a Facebook post of Schnackenberg and the victim and recognized Schnackenberg as the man he saw driving a vehicle on the back road near his camp on the evening of June 17, 2023, between the hours of 6:00 and 6:30 p.m.  Law enforcement searched the area.  A Maine warden noticed car tracks on a dead-end dirt road just over a mile from where the camp owner reported seeing Schnackenberg; the tracks led to the victim's body, which was wrapped and duct-taped in garbage bags and a tarp.

[¶11]  On June 26, 2023, the State filed a complaint charging Schnackenberg with murder, 17-A M.R.S. § 201(1)(A).  A grand jury indicted

him on the same charge on July 13, 2023. Schnackenberg was arraigned on September 29, 2023, and entered a plea of not guilty. The court held a four-day jury trial from January 13, 2025, to January 17, 2025.

[¶12] At trial, the State presented the following evidence (in addition to evidence supporting the facts described above):

- The deputy chief medical examiner testified that the victim had died from multiple gunshot wounds to the head.

- Two black-and-white photographs of the victim's skull taken at the autopsy depicted two entrance wounds in the victim's skull.

- A forensic anthropologist testified that a triangular-shaped bone fragment found in the mop recovered from Schnackenberg's kitchen area matched a bullet defect in the victim's skull.

- A color photograph showed the bone fragment found in the mophead collected from Schnackenberg's house superimposed over the defect in the victim's skull caused by a bullet.

- DNA swabbed from the mop's handle matched Schnackenberg's DNA.

- Blood samples collected from Schnackenberg's kitchen matched the victim's DNA.

- Although the gun found behind Schnackenberg's house could not be test-fired because the barrel was missing, the State's firearm examiner compared the rifling on the bullet recovered from the autopsy to a rifling database and opined that the bullet "could have been fired from the gun or the gun parts" that were recovered behind Schnackenberg's house.

- Duct tape removed from the victim's body was a physical match to the roll of duct tape recovered from a toolbox at Schnackenberg's house.

- In recorded jail calls, Schnackenberg consistently maintained that the victim left the house alive on June 16 and did not take her car.

- Surveillance video from a nearby store showed Schnackenberg at the store on the morning of June 16, contradicting his claim that he had slept until noon that day.

- Cell phone location information from Schnackenberg's phone (1) corroborated the surveillance video footage showing Schnackenberg driving the victim's car and making trips to the area in the vicinity of the Vrieze residence and (2) showed that his phone was connected to the network at all times except between 6:23 p.m. and 8:08 p.m., which was around the time the camp owner had observed Schnackenberg in the remote area near the location where the victim's body was recovered.

[¶13]   Further, the parties stipulated that (1) the body on which the autopsy was performed was that of the victim and (2) the victim had methamphetamine in her system at the time of the autopsy.  Both stipulations were submitted to the jury.

[¶14]  Schnackenberg took the stand and testified.  In his testimony, he admitted (for the first time) to shooting the victim.  He testified that he accidentally shot the victim in self-defense because she was threatening him with a knife during an altercation over drugs. He testified that he and the victim frequently used drugs; the victim had acted violently towards him in the past, sometimes wielding a knife; on the morning of June 16, he and the victim had been using methamphetamine, and a quarrel ensued when she attempted to leave the house with all of the remaining drugs; the victim then grabbed a knife;

he was scared and tried to restrain her; and when the victim slammed her head into his face, the gun he was carrying on his hip fired accidentally when he "must of" pulled the trigger—twice. On cross-examination, Schnackenberg testified that he wrapped up the victim's body, cleaned the kitchen, and took the body to a remote section of the woods.

[¶15] Following the court's instructions to the jury and closing arguments of counsel, the case was submitted to the jury. The jury returned a guilty verdict in under an hour.

[¶16] On March 31, 2025, the court sentenced Schnackenberg to fifty-five years in prison, restitution in the amount of $4,500, and forfeiture of the firearm used during the commission of the offense.

[¶17] Schnackenberg timely appealed. *See* M.R. App. P. 2B(b)(1). On July 16, 2025, the Sentence Review Panel granted leave to appeal his sentence. *See* M.R. App. P. 20(g), (h); *State v. Schnackenberg*, No. SRP-25-178 (Me. Sent. Rev. Panel July 16, 2025).

## II.  DISCUSSION

### A.    Exclusion of Toxicology Report Results

[¶18] Schnackenberg contends that the court erred and abused its discretion by excluding a toxicology report that indicated the specific level of

methamphetamine in the victim's system at the time of autopsy. He maintains that the court "should have allowed [him] to generate testimony about the substances in [the victim's] blood stream and the [e]ffects of drugs at the level displayed in the results" because that evidence was directly relevant to his claim of self-defense and the court's failure to allow him to introduce the evidence compromised his ability to present a complete defense, thus violating his constitutional due process rights.

[¶19]   Schnackenberg sought to introduce the results of the victim's toxicology report through cross-examination of the medical examiner who conducted the autopsy on the victim and issued a report, which incorporated the toxicology report that had been prepared by an analyst from an outside laboratory.   The toxicology report specified the level of methamphetamine found in the victim's system at the time of autopsy and indicated in a comment that the level fell within a range "reported in methamphetamine users who exhibited violent and irrational behavior."

[¶20]   The court sustained the State's objection because Schnackenberg had not yet presented evidence of self-defense.  Defense counsel agreed, noting that at that point, it was "not [yet] relevant."  Several minutes later, while still cross-examining the medical examiner, defense counsel renewed the request

to allow questioning on the toxicology report's results, arguing that the court could conditionally admit the testimony and "defer ruling to a later time [as] to its admissibility and instruct the jury as necessary." The State again objected but suggested that Schnackenberg could recall the medical examiner, if necessary, after he presented evidence of self-defense. The court agreed and denied the request, stating, "In the event there's a request that the witness not be excused, that's another matter."

[¶21] Schnackenberg, however, never renewed the request. Even though his subsequent testimony did generate a self-defense instruction, Schnackenberg did not ask to recall the medical examiner or otherwise seek admission of the toxicology report or its results. As a result, the trial court never made—nor was asked to make—a final ruling on the request to admit through the medical examiner the report or its results. Schnackenberg has therefore failed to preserve this issue for review. *See State v. Gervais*, 2025 ME 27, ¶¶ 19-23, 334 A.3d 645. Because he failed to preserve the issue, we review his challenge for obvious error. *Id.*; *see also State v. Gagne*, 349 A.2d 193, 197 (Me. 1975) (holding that to preserve an objection, a defendant must afford the trial court an "opportunity to make a definitive ruling" and, where a defendant

did not resurrect argument after the trial court indicated that it would address the issue "when we reach it," review on appeal is only for obvious error).

[¶22]   Maine Rule of Unified Criminal Procedure 52(b) provides that errors that are "obvious" or that "affect[] substantial rights" may be "noticed" even if they were not brought to the attention of the trial court.  To constitute obvious error, "there must be (1) an error, (2) that is plain, and (3) that affects substantial rights.  If these conditions are met, we will exercise our discretion to notice an unpreserved error only if we also conclude that (4) the error seriously affects the fairness and integrity or public reputation of judicial proceedings." *State v. Pabon*, 2011 ME 100, ¶ 29, 28 A.3d 1147. "[A]n error is plain when the trial court is derelict in countenancing it, even absent the defendant's timely assistance in detecting it." *Gervais*, 2025 ME 27, ¶ 20, 334 A.3d 645 (quotation marks omitted).  And "an obvious error is a seriously prejudicial error tending to produce manifest injustice." *Id.* ¶ 23 (quotation marks omitted).  Here, we detect no error and certainly no obvious error.

[¶23]  Schnackenberg did not attempt to call or even list as a witness the author of the toxicology report.  Rather, he sought to introduce the report or its results through cross-examination of the medical examiner.  The medical examiner, however, did not conduct the toxicology analysis or write the

toxicology report; he merely incorporated it into his autopsy report. If Schnackenberg was attempting to offer the evidence for its truth through the medical examiner, there was at least a hearsay hurdle to clear. M.R. Evid. 801(c)(1)-(2); *see State v. Gleason*, 2025 ME 52, ¶¶ 18-19, 21-22, 339 A.3d 774; *Smith v. Arizona*, 602 U.S. 779, 783 (2024). Moreover, there is no indication that the medical examiner was qualified to independently assess or confirm the correlation between the specific level of methamphetamine detected in the victim's system and the propensity for violent behavior.

[¶24] Furthermore, the inability to admit the specific level of methamphetamine in the victim's system did not compromise Schnackenberg's self-defense claim. Ultimately, he succeeded in putting before the jury the fact that the victim had been using methamphetamine on the morning of June 16. He testified to that fact, and his testimony was corroborated by the State's stipulation, which was read to the jury, that the victim had methamphetamine in her system at the time of the autopsy. These facts, along with testimonial evidence from several witnesses about the victim's past violent behavior, figured prominently in bolstering Schnackenberg's claim of self-defense, which counsel stressed in closing argument.

[¶25]  We therefore find no merit in Schnackenberg's argument that his inability to introduce the results of the toxicology report was "not remedied by the offered stipulation" and therefore compromised his due process rights.  In the end, he failed to renew his request to recall the medical examiner or to otherwise attempt to introduce the report after he had presented evidence of self-defense.  Because the record contains no indication that the court prevented Schnackenberg from further eliciting this testimony, and because evidence of the victim's methamphetamine use on the day of the murder was admitted and pointedly argued, there was no "court-imposed limitation" on Schnackenberg's ability to pursue his self-defense claim.  *See State v. Jaime*, 2015 ME 22, ¶¶ 42-43, 111 A.3d 1050.

## B.    Admission of the Three Photographs

[¶26]  Schnackenberg next argues that the court abused its discretion in admitting in evidence three photographs depicting the victim's skull wounds. He contends that the photographs were "cumulative, inflammatory, and gruesome and only served to inflame and prejudice [him] in the minds of the jurors" and were therefore inadmissible under M.R. Evid. 403.

[¶27]  "We review evidentiary rulings for clear error and an abuse of discretion," *State v. Hunt*, 2023 ME 26, ¶ 50, 293 A.3d 423 (quotation marks

omitted), and "the trial court's weighing of probative value against the dangers identified in Rule 403 for an abuse of discretion," *State v. Pendleton*, 2025 ME 40, ¶ 33, 334 A.3d 752. As to photographs specifically, we have held that photographs are admissible if (1) they are accurate depictions of what they purport to show; (2) they are relevant; and (3) "their probative value is not outweighed by any tendency toward unfair prejudice." *State v. Marquis*, 2017 ME 104, ¶ 29, 162 A.3d 818 (quotation marks omitted). We conclude for several reasons that the court did not abuse its discretion under Rule 403 by admitting the three photographs in question.

[¶28] First, there is no dispute that the photographs accurately depict the subject matter. Nor is there a dispute that they are relevant to the issues at hand and therefore have probative force.

[¶29] Second, the photographs were not cumulative. They conveyed "relevant information to the jury in a much more complete and meaningful form than could the almost clinical words of [an expert]." *Id.* ¶ 31 (quotation marks omitted). The State offered the photographs to supplement, and illustrate, the testimony of two witnesses: the medical examiner's testimony generally describing the entry and exit wounds in the victim's skull and the forensic

anthropologist's testimony about how the bone fragment from the mophead was likely part of the victim's skull.

[¶30] Third, the court did not abuse its discretion in determining that the probative value of the photographs was not substantially outweighed by undue or unfair prejudice. To sustain a Rule 403 objection, the prejudice must be more than simply damage to the opponent's cause; it must have "an undue tendency to move the tribunal to decide on an improper basis, commonly, though not always, an emotional one." *Id.* ¶ 29 (quotation marks omitted). Even photographs considered to be "gruesome" are not automatically inadmissible; the question is "whether their probative value [is] *substantially* outweighed by the danger of *unfair* prejudice." *Id.* ¶ 31 (quotation marks omitted); *see Aldrich*, 2026 ME 8, ¶ 26, 353 A.3d 987.

[¶31] The photographs at issue here were directly pertinent to the State's ability to prove its case—a "critical factor" in the balancing test under Rule 403. *State v. Lockhart*, 2003 ME 108, ¶ 46, 830 A.2d 433 (quotation marks omitted). The State offered the two black-and-white photographs depicting the entry and exit wounds to support its contention that the shooting was intentional, not accidental; that is, the photographs were corroborating evidence that Schnackenberg had fired the gun twice and thus served to rebut

an assertion that the gun fired accidentally with only a single trigger-pull. The color photograph depicting the missing part of the victim's skull connected the bone fragment found in the mophead in the kitchen to the victim, thus supporting the State's contention that Schnackenberg committed the crime in the house and attempted to clean up afterwards using the mop that had his fingerprints. And this evidence was offered prior to Schnackenberg's subsequent testimony admitting—for the first time—that he shot the victim.

[¶32] Additionally, the court took appropriate steps to mitigate the potential for undue prejudice by sustaining Schnackenberg's objection to the color versions of the two photographs that were admitted only in a black-and-white format. The trial court is given "'great latitude and discretion'" in determining whether the probative value of photographs substantially outweighs the danger of unfair prejudice. *State v. Crocker*, 435 A.2d 58, 76 (Me. 1981). Here, the court carefully and appropriately exercised that discretion.

## C. Adequacy of the Jury Instructions

[¶33] Schnackenberg also contends that the court committed prejudicial error by failing to "properly inform the jury on the dwelling home exception to a person's duty to retreat" as part of the jury instructions on self-defense.

Schnackenberg concedes that the instructions on self-defense were substantively accurate—a point with which we agree. He maintains, however, that, because of the way in which the instructions were arranged, the court "buried" the dwelling-place exception to the duty to retreat pursuant to 17-A M.R.S. § 108(2)(C)(3)(a) (2026)[1] and therefore the instructions "are flawed."

[¶34] Schnackenberg's counsel first raised this concern during an in-chambers discussion, expressing that the court's proposed language was "a little confusing" and stating, "if I were a juror, I would find it unclear to me that

---

[1] The Maine statute governing physical force in defense of a person instructs that

[a] person is justified in using deadly force upon another person . . . [w]hen the person reasonably believes it necessary and reasonably believes such other person is . . . about to use unlawful, deadly force against the person . . . or [w]hen the person reasonably believes: (1) [t]hat such other person has entered . . . a dwelling place . . . and . . . [t]hat deadly force is necessary to prevent the infliction of bodily injury by such other person upon the person . . . in the dwelling place.

17-A M.R.S. § 108(2)(A)-(B).

The statute additionally provides that

a person is not justified in using deadly force as provided in paragraph A if: (1) With the intent to cause physical harm to another, the person provokes such other person to use unlawful deadly force against anyone; (2) The person knows that the person against whom the unlawful deadly force is directed intentionally and unlawfully provoked the use of such force; or (3) The person knows that the person . . . can, with complete safety: (a) Retreat from the encounter, except that the person . . . is not required to retreat if the person . . . is in the person's dwelling place and was not the initial aggressor.

Id. § 108(2)(C)(1)-(3).

if [Schnackenberg] is not the initial aggressor, he has no duty to retreat." It was pointed out during the conference that the proposed draft instructions expressly stated on a prior page that "[a] person is not required to retreat if that person is in the person's dwelling place and was not the initial aggressor." The court nevertheless indicated that it would consider the matter and provide a final, complete version, and Schnackenberg's counsel requested the opportunity "to make a final objection on the record when we see the final version."

[¶35] The final instructions provided as follows:

I will now explain the law relative to the use of deadly force and self-defense. Maine law provides that a person is justified in using deadly force upon another person when the person reasonably believes it necessary and reasonably believes that such person – such other person is about to use unlawful deadly force against the person or a third person. However, a person is not justified in using deadly force against another if, with the intent to cause physical harm to another, the person provokes such other person to use unlawful deadly force against anyone, or the person knows that the person can with complete safely retreat from the encounter, *except that the person is not required to retreat if that person is in the person's dwelling place and was not the initial aggressor*.

Applying the law to this case, if the State proves beyond a reasonable doubt at least one of the following four things, one, that Mr. Schnackenberg, with the intent to cause physical harm to another, provoked [the victim] to use unlawful deadly force against anyone; or two, that Jayme Schnackenberg did not actually believe that [the victim] was about to use unlawful deadly force against him; or three, that Mr. Schnackenberg did not actually believe that

his use of deadly force was necessary to defend himself against [the victim]; or, four, that Mr. Schnackenberg was the initial aggressor in his own dwelling and he failed to retreat from the encounter with [the victim] despite the fact that he knew that he could do so with complete safety, then the State has met its burden of proving beyond a reasonable doubt the absence of self-defense, and you should find Mr. Schnackenberg is guilty of either intentional or knowing murder or recklessly – pardon me, reckless or criminally negligent manslaughter, depending on which of these crimes you found on the basis of the instructions that I earlier gave to you relative to murder and the lesser-included crime of manslaughter.

[¶36] In the final version of the instructions above, the italicized language addressing the dwelling-place exception appeared on the same page as the paragraph following it, which explained the State's burden of proof with regard to the self-defense justification. And, for emphasis, the court italicized the dwelling-place-exception language in the written copy of instructions given to the jury. Schnackenberg did not object when presented with the final version of the instructions, and, following the court's reading of the instructions to the jury, defense counsel affirmed that Schnackenberg was "all set to proceed to closings."

[¶37] When, as here, no final objection was made to the instructions as given, we "review the instructions only for obvious error, that is, highly prejudicial error tending to produce manifest injustice." *State v. Villacci*, 2018 ME 80, ¶ 9, 187 A.3d 576 (quotation marks omitted). We "review the jury

instructions in their entirety to determine if the instructions failed to inform the jury correctly and fairly in all necessary respects of the governing law." *Id.* (alteration and quotation marks omitted); *see State v. Lester*, 2025 ME 21, ¶ 11, 331 A.3d 426.

[¶38]  There was no error here, obvious or otherwise.  The instructions on self-defense, deadly force, and the dwelling-place exception to the duty to retreat were stated accurately and concisely, even given the complexity of the self-defense instruction generally.  *Marquis*, 2017 ME 104, ¶¶ 19, 26, 162 A.3d 818 (noting that "a complex instruction is not per se an erroneous one, particularly when it concerns a multi-part legal analysis" and that "viewed as a whole, in contrast to those in *Baker*," the court's instructions were "internally consistent and legally accurate" (alteration and quotation marks omitted)); *see State v. Baker*, 2015 ME 39, ¶ 14, 114 A.3d 214; *State v. Kilgore*, 2025 ME 81, ¶ 26, 345 A.3d 48; *Villacci*, 2018 ME 80, 187 A.3d 576; *State v. Weaver*, 2016 ME 12, 130 A.3d 972.  The dwelling-place exception was highlighted in italics and placed in close proximity to—on the same page as and adjacent to—the instructions setting out the elements the State was required to prove beyond a reasonable doubt in order to disprove self-defense.

20

[¶39]  The court's instructions were not "materially incomplete" and did not "misstate the law." *Kilgore*, 2025 ME 81, ¶ 28, 345 A.3d 48 (quotation marks omitted).

**D.    Review of Sentencing**

[¶40]  Finally, Schnackenberg challenges on two grounds the sentence he received.[2]    First, he contends that the sentencing court "incorrectly consider[ed] specific details of domestic violence in the first step of its analysis and then consider[ed] those same details in the second step of its analysis." Second, he argues that the sentencing court "incorrectly weighed the mitigating and aggravating factors" in determining his maximum or final sentence.

[¶41]  In imposing a sentence for murder, the court employs a two-step process.  17-A M.R.S. § 1602(2) (2026).  First, the sentencing court sets a basic sentence by considering "the particular nature and seriousness of the offense

---

[2]  Although Schnackenberg's brief alludes to another ground—that "[t]he sentencing court has also imposed a sentence that is excessive when compared to similar crimes"—he does not argue that the sentence is unconstitutionally excessive under the United States Constitution or the Maine Constitution.  Instead, his contention appears to be based on the argument that the sentencing court abused its discretion by imposing a fifty-five-year sentence.  We address the propriety of the sentence, therefore, in the context of the specific challenges discussed above.  We note, though, that as a general matter, the sentence imposed in this case for intentional or knowing homicide is not out of line with sentences we have affirmed in other, similar cases.  *See, e.g.*, *State v. Ketcham*, 2024 ME 80, ¶ 40, 327 A.3d 1103 (affirming a forty-five year sentence for murder involving "execution-style shooting death . . . over a seemingly trivial argument"); *State v. Freeman*, 2014 ME 35, ¶ 23, 87 A.3d 719 (affirming a fifty-year sentence for attempted murder); *State v. Dobbins*, 2019 ME 116, ¶ 60, 215 A.3d 769 (affirming a sixty-five year sentence for murder); *State v. Leng*, 2021 ME 3, ¶ 24, 244 A.3d 238 (affirming a forty-year sentence for murder).

as committed by the individual." 17-A M.R.S. § 1602(1)(A). Second, the court determines the final sentence "by considering all other relevant sentencing factors, both aggravating and mitigating, appropriate to the case." 17-A M.R.S. § 1602(1)(B). "We review the determination of the basic sentence for misapplication of legal principles and abuse of the court's sentencing power." *State v. Leng*, 2021 ME 3, ¶ 17, 244 A.3d 238; *see also State v. Gaston*, 2021 ME 25, ¶ 34, 250 A.3d 137 ("A basic sentence will be reviewed de novo, and will survive appellate scrutiny unless it appears to err in principle." (citation and quotation marks omitted)). Our review of the maximum sentence—which is the final sentence in the case of a murder conviction—is for an abuse of discretion. *State v. Hansen*, 2020 ME 43, ¶ 27, 228 A.3d 1082; *see* 17-A M.R.S. § 1602(2). We review the trial court's "determination of the overall sentence for an abuse of discretion." *State v. Downs*, 2009 ME 3, ¶ 29, 962 A.2d 950. We review a claim of double-counting, if preserved, de novo, *State v. Ellis*, 2025 ME 56, ¶ 16, 339 A.3d 794, or, if no objection was raised, for obvious error, *State v. Murray*, 2026 ME 61, ¶ 19, ---A.3d---.

[¶42]  For the following reasons, we conclude that the sentencing court did not err or abuse its discretion in sentencing Schnackenberg.

22

[¶43]  First, the sentencing court did not misapply sentencing principles in setting Schnackenberg's basic sentence in step one.  The court properly framed the step-one considerations as including "the convicted person's criminal conduct in actually committing the crime at hand," in other words, "the particular nature and seriousness of the crime" and where "the conduct of the person [falls] on a continuum and all manner and methods in which committing that crime could have occurred."  Moreover, courts are expressly directed to "assign special weight" to the factor of domestic violence in imposing sentences for murder.  *See* 17-A M.R.S. § 1603(2)(C) (2026).  In line with these principles, the court found:

> This was an execution-style murder.  [The victim] was facing away from the defendant.  He shot her not once, but twice in the back of the head.  The victim was shot at close range.  The two shots to her head were nearly certain to produce death.  She was attempting to leave him and wanted to take the cat with her.  That was not acceptable.  The defendant's contention that this was an argument exclusively about her taking drugs just did not hold up from the Court's view of the evidence, particularly in light of the timeline. . . . This murder was about issues of power and control. [Schnackenberg] simply could not let her leave the home.  Instead, he killed her.  Murder is the ultimate act of domestic violence.

The court set the basic sentence at forty-five years after further comparing Schnackenberg's conduct with the conduct described in other domestic violence homicide cases presented for its consideration.

[¶44] Far from being a misapplication of step-one sentencing principles, the court's analysis was a concise, textbook example of how a court should apply those principles. Moreover, in its sentencing analysis, the court gave due and proper weight to the factor of domestic violence, as directed by the Legislature. *See State v. Penley*, 2023 ME 7, ¶ 34, 288 A.3d 1183 (noting that murder "as an act of domestic violence is an objective factor properly considered in the first step of the sentencing analysis" (quotation marks omitted)); *State v. Reese*, 2010 ME 30, ¶ 30, 991 A.2d 806 (holding that in determining the basic sentence, the court acted properly in considering that the crime "occurred within the context of a violent relationship").

[¶45] Second, we reject Schnackenberg's argument that the court abused its discretion by giving "too much weight to the domestic violence aspect of the case and the impact on the victim's family" and erred by improperly "double-counting" domestic violence as a factor in step two where that factor had already been considered in step one.

[¶46] We afford considerable leeway to sentencing courts in assessing and balancing aggravating and mitigating factors. *See State v. Ketcham*, 2024 ME 80, ¶ 35, 327 A.3d 1103. The court found two mitigating factors—lack of a significant criminal record and consistent employment despite ongoing

struggles with substance use—and determined that these factors were substantially outweighed by aggravating factors, which included in particular the profound impact of the murder on the victim's family and friends. The court further found that Schnackenberg's extensive efforts to conceal the crime and to "mislead and misdirect everyone who was trying to find some answer about [the victim]" exacerbated the impact of the "senseless cruelty" that he had perpetrated. Victim impact is an appropriate aggravating factor. *See State v. Fleming*, 644 A.2d 1034, 1036 (Me. 1994) ("The crime's impact on the victim is a relevant consideration in sentencing . . . ."); *State v. Lord*, 2019 ME 82, ¶ 36, 208 A.3d 781 (noting that "the profound effect of the crimes on the families of the murder victims" is a "proper and classic aspect[] of the step two analysis"). In the circumstances here, the court did not abuse its discretion by assigning substantial weight to the effect of Schnackenberg's actions on the victim's family.

[¶47] Finally, contrary to Schnackenberg's contention, the court did not double-count the domestic violence factor in steps one and two. While the court mentioned that Schnackenberg "couldn't let [the victim] leave, and he couldn't let her do so with the cat," thus alluding to an earlier comment about Schnackenberg's exercise of power and control over the victim, these

statements were made in the context of considering the impacts on family and friends, which is made clear by the court's next sentence: "If he would have simply let her leave, she and Mr. Schnackenberg simply would have gone on living their separate lives. The family and the community would not have been deprived of her presence, her friendship, her talents, and her contributions."

The entry is:

Judgment and sentence affirmed.

---

Jeremy Pratt, Esq. (orally), and Ellen Simmons, Esq., Pratt & Simmons, P.A., Camden, for appellant Jayme Schnackenberg

Aaron M. Frey, Attorney General, and Leanne Robbin, Asst. Atty. Gen. (orally), Office of the Attorney General, Augusta, for appellee State of Maine

Aroostook County Unified Criminal Docket docket number CR-2023-30271
FOR CLERK REFERENCE ONLY